**NORTHWESTERN BANK, Plaintiff,**

v.

**FIRST VIRGINIA BANK OF DAMASCUS, Defendant.**

**Civ. A. No. 82–0219–A.**

United States District Court,
W.D. Virginia,
Abingdon Division.

April 26, 1984.

Stephen M. Hodges, Penn, Stuart, Eskridge & Jones, Abingdon, Va., for plaintiff.

Joseph P. Johnson, Abingdon, Va., for defendant.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

The plaintiff Northwestern Bank is a state banking corporation organized under the laws of North Carolina with its principal place of business in the State of North Carolina. The defendant First Virginia Bank of Damascus, Virginia is a state banking corporation organized under the laws of the Commonwealth of Virginia. Jurisdiction over this case is based upon diversity of citizenship and the amount of controversy in excess of ten thousand dollars ($10,000), excluding interest and costs. 28 U.S.C. § 1332. The plaintiff is seeking

to establish the priority of its security interest in a Caterpillar 920 wheel loader, serial number 62K8881, over the lien that the defendant claims. This case is before the court on cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The parties submitted this case on depositions with accompanying exhibits and stipulations. As the court heard oral argument on March 15, 1984, this case is ready for disposition.

The relevant facts are undisputed. Marvin W. Ray Shepherd and Bill McElwee, Esquire, incorporated Ray Shepherd Lumber Company in the 1950's. Sometime in 1965 Ray Shepherd acquired all the company's stock and continued operating the lumber business in North Wilkesboro, North Carolina. Although the Northwestern Bank sold most of the logging equipment in July, 1982 to satisfy outstanding indebtedness, the Ray Shepherd Lumber Company still exists since it has not been formally dissolved. Ray Shepherd serves as president. (Deposition of Marvin W. Ray Shepherd at 4–6). His son, Billy J. Shepherd, was vice president from 1981 until the liquidation of assets in 1982 (Deposition of Billy J. Shepherd at 4), and his nephew, Jerry Lee Shepherd, was corporate secretary and bookkeeper. (Deposition of Jerry Lee Shepherd at 4–5). According to these corporate officers, the board of directors and the officers did not hold meetings, nor did the secretary keep corporate minutes. (Depositions of Marvin W. Ray Shepherd at 7; of Jerry Lee Shepherd at 8). However, a corporate resolution of Ray Shepherd Lumber Company authorizes Marvin W. Shepherd and Billy J. Shepherd or Jerry Shepherd to borrow money from the Northwestern Bank. (Exhibit 17).

On October 20, 1978 the Ray Shepherd Lumber Company purchased a new Caterpillar 920 wheel loader, serial number 62K8881, from Carolina Tractor and Equipment Company. (Exhibit 9). This loader was adopted so that it could move and load logs around a sawmill and logging yard. (Deposition of Bobby Ray Shepherd at 30–32). The plaintiff bank loaned the lumber

company twenty-five thousand dollars ($25,000) on a ninety-day promissory note with a rate of interest at the prime rate plus one due on March 15, 1982. (Exhibit 11A). The Northwestern Bank took a security interest in this new wheel loader (Exhibit 11B) and perfected its security interest in this particular piece of equipment in the Register of Deeds Office in Wilkes County, North Carolina on December 21, 1981 (Exhibits 13 & 13A) and in the Department of the Secretary of the State of North Carolina on August 5, 1982. (Exhibit 18). The North Carolina bank earlier had filed a financing statement including "all rolling stock, *sawmill equipment* and office equipment used in the operation of Ray Shepherd Lumber Company, Inc." with the Wilkes County Register of Deeds on February 6, 1981 and the Secretary of State on February 9, 1981. (Exhibits 15 & 16) (emphasis added).

The loader was taken into Virginia via Mountain City, Tennessee during January, February, or March, 1982. (Depositions of Marvin W. Shepherd at 16–17; of Billy J. Shepherd at 7; of Bobby Ray Shepherd at 27–28). It remained at the logging yard in Damascus for two or three months according to Ray Shepherd. (Deposition of Marvin W. Shepherd at 16). Clyde Combs, president of First Virginia Bank, noticed it had been removed in July, 1982. (Deposition of Clyde Combs at 8, 12). Shortly before the liquidation sale in July, 1982 the loader was brought to Virginia. It subsequently has been sold, and the proceeds are in an escrow account at the defendant bank.

On March 23, 1982 Ray Shepherd, William B. Staley, and Jerry R. Jones applied for a loan with the First Virginia Bank of Damascus. These men were opening a logging yard in Damascus as a partnership or joint venture. Ray Shepherd Lumber Company had operated a logging yard in the area before, and the defendant bank had become acquainted with it. The First Virginia Bank took Ray Shepherd's word that he owned the loader, that it was not mortgaged, and that the bank could have a mortgage on it. (Deposition of James A.

Bishop at 41–42; of Clyde Combs at 18). After checking with a reliable workman at the lumber yard, the defendant bank acted on the past practices and appearances. In actuality, the three men had no interest in the loader, for the corporation never sold it and still owns it. (Depositions of Marvin W. Shepherd at 14–15; of Billy J. Shepherd at 4–5). The defendant bank loaned the men twenty-five thousand dollars ($25,000) for a ninety-day period with a rate of interest at 18% due on June 24, 1982 (Exhibit 5) and took a security interest in a 920 Caterpillar wheel loader and a 470 Franklin log skidder. (Exhibit 6). The defendant bank perfected its security interest by filing a financing statement in the Circuit Court Clerk's Office in Washington County, Virginia on March 29, 1982 (Exhibit 4) and belatedly with the Virginia State Corporation Commission on July 29, 1982. (Exhibit 7). Around the time of this last filing, James Bishop talked with Paul Holbrook, vice-president of the Northwestern Bank, who told him that the North Carolina bank did not have an interest in the loader. (Deposition of James A. Bishop at 47–48). After the plaintiff learned that the loader was in Virginia, the Northwestern Bank sought to perfect its security interest in Virginia by filing a financing statement in the Circuit Court Clerk's Office in Washington County, Virginia on August 6, 1982 (Exhibit 14) and with the Virginia State Corporation Commission on August 11, 1982. (Exhibit 22). As neither note has been fully paid, each bank seeks to establish its respective right to the sale proceeds of the loader.

The plaintiff contends that the defendant does not have an enforceable security interest in the loader. Alternatively, the Northwestern Bank argues that it perfected its security interest in Virginia prior to the filings by First Virginia Bank. The defendant asserts that the corporation is an instrumentality of the sole stockholder since the directors and officers failed to follow corporate formalities. The Virginia bank also alleges that since the loader is not listed specifically with the equipment in the

financing statement filed in Wilkes County on February 6, 1981 and recorded with the Secretary of State on February 9, 1981, the plaintiff's security interest is not properly perfected.

■ The first issue to decide is whether there is an enforceable security interest. Under the law of Virginia a security interest is unenforceable against the debtor or a third person and does not attach unless three requirements are met:

(a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral …; and

(b) value has been given; and

(c) the debtor has rights in the collateral.

Va.Code § 8.9–203(1) (Supp.1983). The Uniform Commercial Code defines a "debtor" as

the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral, and includes the seller of accounts or chattel paper. Where the debtor and the owner of the collateral are not the same person, the term "debtor" means the owner of the collateral in any provision of the title dealing with the collateral, the obligor in any provision dealing with the obligation, and may include both where the context so requires.

Va.Code § 8.9–105(1)(d) (Supp.1983).

■ The first statutory requirement provides for the debtor to sign a security agreement containing a description of the collateral, if the secured creditor surrenders possession of the collateral pursuant to the agreement. The undisputed evidence is that the Ray Shepherd Lumber Company purchased the loader and never has sold it. The corporation's president and secretary executed a security agreement in their official capacities to secure the loan made by the Northwestern Bank to the lumber company. (Exhibit 11B).

Thus the debtor corporation signed the security agreement with the plaintiff. Under the provisions of the Code if the debtor and owner actually are different people, then "debtor" means the owner, and the owner must sign the agreement for the security interest to be enforceable. When the three entrepreneurs individually signed the security agreement with First Virginia Bank (Exhibit 6), the corporate signatories obviously were missing. Since the true owner did not sign this agreement, it fails to meet the first requirement. *See First Southern Bank v. McCullough,* 32 U.C.C.Rep. 1321, 1323 (Tenn.Ct.App.1982). *See generally* Annot., 3 A.L.R. 4th 502 (1981). Both security agreements meet the second requirement, for each bank lent twenty-five thousand dollars ($25,000) to each group of borrowers.

■ The third provision requires the debtor to have rights in the collateral. The Rhode Island Supreme Court has stated:

The phrase "rights in the collateral" as used in § 6A–9–204(1) has no clear definition. However, the code recognizes that a debtor who does not own the collateral may nonetheless use the collateral for security, thereby acquiring "rights in the collateral," when *authorized* to do so by the actual owner of the collateral.

*General Motors Acceptance Corp. v. Washington Tr. Co.,* 120 R.I. 197, ——, 386 A.2d 1096, 1098–99 (1978) (emphasis supplied). *See Clearfield State Bank v. Contos,* 562 P.2d 622, 624 (Utah 1977). Generally, a debtor must have rights in property before he may create a security interest in it, and in the absence of special circumstances a security interest attaches only to the extent of the debtor's interest. *First Nat'l. Bank & Trust Co. v. Smithloff,* 119 Ga.App. 284, 290, 167 S.E.2d 190, 197 (1969). Mere possession by the debtor is insufficient to establish a right in the collateral upon which to base a security interest; absent consent, estoppel or special circumstances, one person may not encumber another person's property. *Id.; Montco,*

*Inc. v. Glatzer (In re Emergency Beacon Corp.),* 665 F.2d 36, 40 (2d Cir.1981); J. White & R. Summers, *Uniform Commercial Code* § 23-4 at 916 (2d ed. 1980); 79 C.J.S. Supp. *Secured Transactions* § 12 at 18 (1974 & Supp.1983). The debtor must acquire some ownership interest in the collateral before a valid security interest arises. *Chartered Bank of London v. Chrysler Corp.,* 115 Cal.App.3d 755, 171 Cal.Rptr. 748, 750, 30 U.C.C.Rep. 1438, 1440–41 (1981). A debtor possesses "rights in the collateral" if the true owner agrees to the debtor's use of the property as security or if the true owner is estopped to deny the creation or existence of the security interest. *In the Matter of Pubs, Inc.,* 618 F.2d 432, 436 (7th Cir.1980) (citations omitted). Recently the Nebraska Supreme Court invalidated a security interest in a van. The president of Val-U Construction Company secured a personal loan by giving a security interest in a corporately-owned vehicle. Under Nebraska law the presumption that ordinary actions of the corporate officials are authorized is inapplicable to the diversion of corporate property as security for a personal debt, and the fact that the president used corporate property to benefit himself placed the creditor on notice to ascertain his authority. Since the president had no authority to encumber the property, the security interest was invalid. *Val-U Construction Co. v. Contractors, Inc.,* 213 Neb. 291, 293, 328 N.W.2d 774, 776, 35 U.C.C.Rep. 1299, 1301–02 (1983).

The evidence fails to reveal that the Ray Shepherd Lumber Company gave Ray Shepherd permission or actual authority to secure the loan by First Virginia Bank with the loader. The security agreement shows that Ray Shepherd did not sign it in his capacity as president and that Jerry Shepherd, the secretary, did not subscribe at all. The officials of First Virginia Bank contend they had dealt with Ray Shepherd in the past when he operated another logging yard. Yet on this occasion three men approached the employees of the defendant for a loan and informed them that they were opening another logging yard as a partnership or a joint venture. As the bank had dealt with Ray Shepherd and the lumber company previously, the defendant should have investigated the interrelationships of these businesses before approving the loan. The evidence shows no permission from the lumber company to encumber the loader.

The last circumstances under which the threesome could have obtained rights to the collateral is estoppel. Under Rule 8(c) of the Federal Rules of Civil Procedure, estoppel is an affirmative defense which must be specifically pleaded. As the defendant's answer and motion for summary judgment are silent on this defense, the court considers the defense waived.

Accordingly, the court determines that the defendant's security interest is unenforceable because the three men had no property rights, by ownership, consent, or estoppel, to the wheel loader and because the true owner did not sign the security agreement. The court further concludes that the plaintiff has an enforceable security interest because the Ray Shepherd Lumber Company owned the loader and because the corporation through its authorized agents signed the security agreement. Having determined the defendant has an unenforceable security interest, the court refrains from deciding the priority of the security interests. Thus, the plaintiff's motion for summary judgment is granted and the defendant's motion for summary judgment is denied.